Richard R. Barker
Acting United States Attorney
Eastern District of Washington
Lisa Cartier-Giroux
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | 2:24-CR-00128-TOR |
| Plaintiff, | United States' Response to Defendant's Sentencing Memorandum |
| v. | |
| ABRAHAM AGUILAR-LEON, | |
| Defendants. | |

Plaintiff, United States of America, by and through Richard R. Barker, Acting United States Attorney for the Eastern District of Washington, and Lisa Cartier Giroux, Assistant United States Attorney for the Eastern District of Washington, submits the following Sentencing Memorandum.

I.      **REVIEW OF PRESENTENCE REPORT (PSIR)**:

The United States agrees with the calculations in the PSIR and has no objections. *See* ECF Nos. 36 and 41.

II.     **SUMMARY OF CONDUCT SUPPORTING THE UNITED STATES' SENTENCING RECOMMENDATION**

The Guideline Range as calculated by the parties and the PSIR is 46-57 months. *See Id.*; ECF No. 33. The United States recommends a sentence of 48 months' incarceration, followed by 3 years of supervised release and opposes

Response to Defendant's Sentencing Memorandum - 1

Defendant's request for a 24-month sentence, which would require a substantial variance or downward departure from the guideline. The United States submits that the facts support its recommendation of a Guideline sentence.

On July 14, 2024 at approximately 9:40 pm, patrol in the City of Chelan, Chelan County, was assisting the Chelan County Coroner with a missing person who had been located deceased in the water near River Walk Park. As Deputies Wiggum and Soreano were assisting the coroner, they heard a disturbance coming from the Dan Gordon Bridge which was approximately 250 – 300 yards to the southwest of the Deputies location. The disturbance was described as 10 - 15 minutes of screaming and cursing.

Deputy Wiggum recalled seeing a large group of males in the area as he was responding to assist the coroner and suspected they might be causing the disturbance. Deputy Soreano decided to go investigate the disturbance while Deputy Wiggum continued to assist the coroner. Deputy Soreano responded to the area of the disturbance and a short time later requested assistance. Deputy Wiggum quickly responded and observed Deputy Soreano with a shirtless male wearing black shorts and black shoes and wearing a green backpack. That male would later be identified through a WA driver's license as the defendant, Abraham Aguilar-Leon.

As Deputy Wiggum was assisting Deputy Soreano, a male who was driving a grey Nissan Titan approached and stopped in the north bound lane. The driver of the Nissan had his window down and was pointing at Defendant as he asked Deputy Wiggum if that was the guy who threatened to shoot him. The driver was directed to pull over to the side of the road so Deputy Wiggum could speak with him. Deputy Wiggum met with the driver of the Nissan and noticed a female sitting in the passenger seat. The driver told Deputy Wiggum, he and the

Response to Defendant's Sentencing Memorandum - 2

female were driving across the Dan Gordon Bridge when a male jumped in front of his truck and threatened to shoot him. Defendant was brought over, and the driver was told that the person he was being shown may not be the person who threatened him. The driver looked at Defendant and told the deputy that the individual who threatened to shoot him was the person being show to him. Deputy Wiggum then determined there was probable cause to arrest Defendant for felony threats.

Deputy Wiggum relayed the positive identification information to Deputy Soreano. As deputies attempted to place Defendant under arrest for the felony threats, he attempted to pull away and flee. After a brief struggle, the Deputies were able to gain control of Defendant and place him under arrest. As the Deputies were taking Defendant into custody, they removed Defendant's backpack as it was in the way of properly applying the handcuffs. Deputies then assisted Defendant to his feet, and as the Deputies were escorting Defendant to the patrol vehicle, he became belligerent and began cursing at the Deputies. Defendant stated, "fuck you nigga" and "suck my dick nigga" numerous times (recorded on body camera).  Defendant stated, "touch me again nigga , see what happens". The Deputies did not react to Defendant's verbal abuse.

Defendant was searched incident to arrest by Deputy Soreano then placed in the patrol car. The deputies did then search his backback. Per CCSO Department policy, CCSO law enforcement personnel are unable to leave large bags such as backpacks at the jail for suspects and they are booked into evidence for safe keeping.  Additionally, per CCSO Department policy, bags must be inventoried prior to being logged into evidence to document items of value and ensure there are no hazards.  On body camera, Deputy Wiggum asked Defendant if there was anything in his backpack, they [law enforcement] needed to know

Response to Defendant's Sentencing Memorandum - 3

about. Defendant said something to the effect of "you are not going through my backpack". Deputy Wiggum informed Defendant, he was under arrest and his bag was going to be searched. Deputy Soreano attempted to read Defendant his constitutional rights, but Defendant screamed over Deputy Soreano and refused to acknowledge his rights.

     Deputy Wiggum then searched Defendant's backpack on the hood of his patrol car. As Deputy Wiggum opened the main compartment, he immediately observed the distinct, black handgrips of two pistols that had magazines inserted.

     Deputy Wiggum emptied the bag and placed both pistols, along with the other contents on the hood of his patrol vehicle. Deputy Wiggum observed that the first handgun was a silver and black Glock 37 .45 GAP (SN FUD338). Deputy Wiggum observed the Glock 37 had a barrel stamped ".40 S&W". It was equipped with a red dot optic on the slide and a flashlight/green laser mounted on front. The magazine that was seated in the Glock firearm was a .45 caliber magazine, containing five .40 ACP rounds; there was also a .40 caliber round in the chamber. The firearm also was equipped with a Glock switch.

Response to Defendant's Sentencing Memorandum - 4



Response to Defendant's Sentencing Memorandum - 5



The other firearm was a polymer Glock-style magazine. The second pistol was black, also with an extended magazine inserted, and no visible markings on the slide or a serial number. On the underside of frame, there was a blank serial number plate. The magazine was inserted and there was no round in the chamber. The magazine contained twelve (12) 9 mm rounds.

Response to Defendant's Sentencing Memorandum - 6



The switch was later tested by an ATF Firearms Enforcement Officer who concluded that the switch enabled the firearm to fire cartridges automatically. Both firearms were functional.

The ride to the police station with Defendant is also captured on the in-car video, and documents the character of Defendant. It's a very long ride made significantly longer by Defendant's nonstop cursing out of the deputy and screaming about his handcuffs being too tight. Handcuffs are admittedly uncomfortable, especially when cuffed behind the back. Being handcuffed behind one's back is an unnatural position for the arms to be in and, even when properly applied, the cuffs are going to apply pressure to the wrist area as they restrain the movement of a subject. However, the deputy checked the cuffs after Defendant claimed they were too tight. He told Defendant that he couldn't loosen them any further and remined him that he had tried to run so he could not make them so loose that he could get out of them. He also told him several times to stop struggling with the cuffs so they would not tighten up on him. Defendant

Response to Defendant's Sentencing Memorandum - 7

however kept struggling with the cuffs, screaming, and cursing out the deputy. Despite the consistent verbal abuse, the deputy remained professional, saying only in one response to a flurry of curses, "do you talk to your mother with that mouth?" to which Defendant told him to "suck his dick".

At the police booking station, officers placed Defendant into an interview room where he would be booked. While in the interview room, Sgt Lewis was attempting to make Defendant more comfortable by further adjusting his handcuffs. Sgt. Lewis adjusted one cuff, and Defendant became belligerent and stated, "shut the fuck up bitch" and kept repeating, "shut the fuck up".

Arrangements were made to temporarily house Defendant in Chelan County Jail. While booking Defendant, he continued to be belligerent to TFO Cyrus Bowthorpe and two HSI Special Agents, calling them "punk ass bitches" several times. Defendant demanded his cell phone, and when TFO Bowthorpe told him that the phone was seized pending a search warrant, Defendant replied, "fuck you bitch".

Later, arrangements were made to transport Defendant to the Spokane County Jail. When HSI SA Luke Lambert and TFA Bowthorpe responded to Chelan County Jail to pick up Defendant for transport, Defendant was in a holding cell. The Jail Corporal informed the agents that Defendant had been fed lunch, then turned to Defendant and asked if he would like a sack lunch also for the transport. Defendant then stated in substance, "fuck off bitch".

Ballistic images from test firing the firearm with the Glock switch were entered into NIBIN. A NIBIN lead notification was subsequently generated indicating that the firearm may have been used in a shooting in Sunnyside, WA on February 16, 2024, during which after an argument, a male victim's car had been shot at numerous times as it was parked. A witness at the scene advised that

Response to Defendant's Sentencing Memorandum - 8

an individual she knew as "Abraham" had just had a confrontation with the victim. Both the victim and a 911 caller identified the shots fired as what sounded like gunfire from an automatic weapon.

### III.    APPLICATION OF § 3553(a) FACTORS AND SENTENCING RECOMMENDATION:

The Court must not only consider the applicable advisory guidelines, but the factors as set forth in 18 U.S.C. § 3553, which states, in relevant part, that: [t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> 
> (2) the need for the sentence imposed
> 
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> 
> (B) to afford adequate deterrence to criminal conduct;
> 
> (C) to protect the public from further crimes of the defendant; and
> 
> (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(1) and (2).

A. *The nature and circumstances of the offense(s)*

While there was no physical injury to other individuals, the offense before the Court is very serious and reflects an individual who has no respect for the law, law enforcement officers, or his fellow community members. While it is true that Defendant is a Criminal History Category I, in a very brief timeframe,

Response to Defendant's Sentencing Memorandum - 9

Defendant has shown a proclivity for firearms and a willingness to use them when angered. He has a belligerent attitude towards authority and has displayed a level of unprovoked aggression towards law enforcement that is concerning. Defendant cannot blame the conduct on his circumstances or others, as suggested in his sentencing memo – a version of events not supported by any evidence or statements made at the time to law enforcement by Defendant, and belied by his continuing abusive conduct at the jail staff who offered him the bagged lunch. Based on the evidence and known conduct, the United States believes that such excuses reveal that the only remorse he may show at sentencing would be sourced solely from the prospect of consequences the Court has the authority to impose *on him*, not from any genuine regret for the impact of his actions on others.

   *B. The history and characteristics of the Defendant;*

   Defendant is 19 years old. He does report abuse and/or neglect in the home during childhood, but states that he and his mother has resolved their issues for the most part, and he had resided with his maternal half-sister after leaving his mother's care. *See*, PSIR at ¶45.

   Defendant claims he is not in a gang but was accompanied by Sureno gang members during this incident. *See*, Id. at ¶48.

   Defendant has clearly embraced a criminal lifestyle. Although he is young, he now suffers from consequences of his actions and his age does not outweigh this Court's need to protect the public from Defendant and to give a sentence reflective of all the 3553(e) factors.

   Defendant's history and characteristics support a sentence of 48 months. The presence of aggravating factors far outweighs any mitigating factors therefore, a lesser sentence is not supported on these facts.

Response to Defendant's Sentencing Memorandum - 10

*C. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct;*

As noted, the Defendant's recent possession of firearms, to include a machine gun, as well as his conduct after the arrest in this matter, represents a complete lack of respect for the law and the safety of the community. Furthermore, Defendant has received an additional benefit as the Chelan County prosecutor in Case No. 24-1-00259-4 (involving the charges resulting from the threats) and the Yakima County prosecutor in Case No. 24S01374 (for the firearm discharge on 2/16/2024) have both agreed to dismiss their charges/not seek as a result of Defendant pleading guilty in this matter.

*D. The need for the sentence imposed to protect the public from further crimes of the defendant;*

As stated, Defendant appears to have embraced a criminal lifestyle. In fact, it appears his conduct escalated and placed the public at risk, after taking his anger out on the victim's vehicle on February 16, 2024.

The Court will rightfully consider his age. However, his age does not erase his potential risk as Defendant has shown disdain for authority and a willingness to harm or physically threaten others. Defendant will still have those criminal associations that will allow him to rejoin a criminal lifestyle after he is released. The recommended sentence, in consideration of the state court dismissals and no seek, ensures protection of the public from Defendant's future criminal conduct.

Response to Defendant's Sentencing Memorandum - 11

    E. *The need to provide Defendants with education or vocational training, medical care, or other correctional treatment in the most effective manner;*

A 48-month sentence will allow Defendant the opportunity to obtain training or treatment if he so chooses, and he will be given access to services he would not otherwise be provided.

    F. *The need to avoid unwarranted sentencing disparity;*

A primary consideration of this Court and the United States is sentencing disparity. The United States must do its best to treat similarly situated defendants, similar. The recommended Guideline sentence of 48 months would not create any unwarranted sentencing disparity.

    G. *Conclusion*

The United States looks to the application of the 18 U.S.C. § 3553(a) factors in assessing a reasonable recommendation for sentence; this includes an analysis of aggravating or mitigating factors. This case is not just about affording an adequate punishment but also sending a strong deterrent message as to this conduct and preventing future criminal activity by Defendant. Based upon review of those aggravating and mitigating factors, a sentence of 48 months in for Defendant's conduct is appropriate.

    DATED June 6, 2025

                                      Richard R. Barker
                                      Acting United States Attorney

                                    *s/Lisa Cartier-Giroux*
                                    Lisa Cartier-Giroux
                                    Assistant United States Attorney

Response to Defendant's Sentencing Memorandum - 12

CERTIFICATION

I hereby certify that on June 6, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to Defendant's counsel of record using the CM/ECF system.

*s/Lisa Cartier-Giroux*
Lisa Cartier-Giroux
Assistant United States Attorney

Response to Defendant's Sentencing Memorandum - 13